IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Case No. 7:23-CV-01680-M

| | | |
|---|---|---|
| SHERI ANN GAYHART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| SOUTHERN FARM BUREAU LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on Defendant Southern Farm Bureau Life Insurance Company's (the "Defendant's") motion for partial summary judgment [DE 25], Plaintiff Sheri Ann Gayhart's (the "Plaintiff's") motion for partial summary judgment [DE 29], and Plaintiff's motion in limine [DE 33]. For the reasons that follow, Defendant's motion for partial summary judgment is granted in part and denied in part, and denied in part as moot, Plaintiff's motion for partial summary judgment is denied, and Plaintiff's motion in limine is denied in part and denied in part without prejudice.

## I.  FACTUAL BACKGROUND

The following facts are undisputed, except where noted:

Plaintiff is a citizen and resident of Onslow County, North Carolina. DE 26 at 1. She is married to Chester Gayhart. *Id.* The Gayhart's son is Craig Evan Gayhart, now deceased ("Decedent"). *Id.*; DE 30 at 1.

Decedent was born in May 2001. DE 30 at 1. He graduated from high school in June 2020 and began working as an emergency medical technician ("EMT"). *Id.* Decedent lived with his parents in Jacksonville, North Carolina. *Id.*

The year before Decedent graduated from high school, Plaintiff obtained a life insurance policy (the "Policy") for him, which Defendant issued. DE 26 at 2; DE 31-1 at 21-22. The Policy listed Decedent as the Primary Insured and Plaintiff as the Owner of the Policy. *Id.*; DE 31-1 at 21-22. The face amount of the Policy was $250,000. *Id.* The Policy also had a Children's Term Rider (the "Rider"), which would pay out $20,000 in the event that a child of the Insured died while the Rider was in force. *Id.* at 2-3; *see also* DE 27-2 at 3-4.

The Policy contains an Incontestability Clause, which provides that, subject to one exception not relevant here, Defendant may not contest the Policy "after it has been in force during the lifetime of the Insured for two years." *Id.* at 2; *see also* DE 27-2 at 3. The Policy also contains a Suicide Clause, which states that "[i]f the Insured dies by suicide while sane or insane within two years from the Date of Issue . . ., the total liability of [Defendant] will be limited to the refund of the premiums actually paid." *Id.; see also* DE 27-2 at 3. The term "suicide" is not defined in the Policy. *See id.*

On August 18, 2021, approximately 21 months after the Policy issued, Plaintiff and her husband went to a local fast-food restaurant to pick up dinner. *Id.* at 3. Decedent was at their home. *Id.* Plaintiff texted Decedent to ask whether he wanted any food, to which Decedent responded: "I'm fine, Thank You. Goodnight." *Id.*

Plaintiff and her husband returned home to find Decedent on the kitchen floor with a gunshot wound to his head. *Id.* at 3-4; DE 27-9 at 5; DE 27-10 at 4-5. Plaintiff called 911 and reported that Decedent killed himself. *Id.*; DE 27-9 at 5.

Law enforcement arrived on the scene shortly before 7:00 p.m. DE 27-11 at 2. An officer located Decedent "laying in the supine position on the kitchen floor." *Id.* at 4. Decedent's "head was up against the base of the refrigerator and his feet were near the cabinets by the sink." *Id.* Decedent, who has right-handed, had an entrance wound on the right side of his head above his right ear, and an exit wound on the left side of his head. DE 27-10 at 4; DE 31-1 at 108.

On the kitchen counter, the officer observed "a silver Smith & Wesson revolver that appeared to have blood and human hair on the muzzle," indicating that the firearm was pressed to the side of Decedent's head when it fired. DE 27-11 at 4; *see also* DE 27-10 at 4 (reflecting "C shaped barrel mark to the top of the [entrance] wound"); DE 31-5 at 11; DE 36-3 at 26. Nearby, on the stove, was "a cell phone playing a video." *Id.* The officer could not locate a pulse on Decedent, and "did not perform any life saving measures" because "the sustained injury" was "incompatible with life." *Id.*

Another officer arrived on the scene shortly thereafter. *Id.* at 5. Law enforcement conducted "a security sweep of the residence" but "did not locate any other persons." *Id.* They also did not "observe any evidence" that would "indicate a struggle took place." *Id.*

Detective Tollefsrud, a detective with the Onslow County Sheriff's Office, arrived next. *Id.* at 6. He interviewed Mr. Gayhart, Plaintiff's husband. *Id.* Mr. Gayhart indicated that his son "has never been suicidal," but "does have a sick sense of humor" and "has made suicidal comments," but that "no one has ever taken it seriously" because Decedent "always" said he was "just joking." *Id.* at 7.

Detective Tollefsrud interviewed Plaintiff next. *Id.* Plaintiff stated that "she keeps a revolver . . . in the kitchen cabinet by the sink." *Id.* The gun was kept "fully loaded with live

rounds." *Id.* In addition, the kitchen cabinet "has clear glass on the doors," so "anyone could have seen the gun in the cabinet." *Id.*

Further investigation revealed several "live rounds of .38 special ammunition laying on the floor." *Id.* Law enforcement found "one spent cartridge" in the gun, which was "in the '12:00' position," such that "the bullet would have had to be placed perfectly for it to be aligned in going off." *Id.* at 7-8.

Decedent's phone was "playing . . . a music video" on "youtube," and "was hooked to Bluetooth via a ear piece which was laying on the floor under" Decedent. *Id.* at 8. "Detective Tollefsrud went through" Decedent's phone while on the scene and found "nothing suspicious." *Id.* He also searched Decedent's bedroom "and found nothing suspicious." *Id.*

Subsequent investigation by law enforcement revealed additional evidence on Decedent's phone. First, approximately one hour before his death, Decedent was in the process of drafting an email to his manager at work. *See* DE 31-3 at 1. The draft message highlights a series of workplace concerns, including that Decedent and his fellow "EMTs are overworked and truly underpaid." *Id.* at 3. The record does not reflect that Decedent ever sent the email to his manager.

In addition, Detective Tollefsrud located a note on Decedent's phone entitled "If I Die – Kinda Will." DE 27-11 at 9. The note explains Decedent's desired funeral arrangements, a general plan for disposition of his possessions, and includes messages to certain family and friends. DE 31-3 at 6-10. The note bears a time stamp reflecting that it was last edited on September 6, 2020, nearly one year before Decedent's death, but this evidence is disputed. *See id.* at 6; *see also* DE 49-1 at 2 (deposition testimony indicating that "last modified date" of note "was actually May 13th

of 2024")[1]. In her deposition, Plaintiff stated that she told Decedent "to make . . . a will," so that she would "know what [Decedent] wanted done with [his] things if something happened." DE 31-1 at 125.

After securing and processing the scene, law enforcement contacted Nurse Sharon Brookins, the medical examiner for Onslow County. DE 27-16 at 3. Around 9:00 p.m. that evening, Brookins said that "as of now no autopsy would be performed" and that the incident would be classified as "an accidentail [sic] shooting death," because "there was no suicidal history and Decedent could have "just been playing with the gun," resulting in "an accident." DE 27-11 at 8. A "Preliminary Summary" by Brookins further reflects that Decedent had "no known medical history," "no history of substance" or alcohol "abuse," and "no history of depression or suicidal ideation." DE 27-10 at 5. Decedent also had "a full time job and work friends he socializes with." *Id.* Because law enforcement "did not find any [evidence of] premeditation," such as a "suicide note," Brookins determined "Decedent's Death . . . to be Accidental." *Id.*

In her deposition, approximately three years after the incident, Brookins testified that she rendered that preliminary determination even though she "had a lot of questions" about what occurred. DE 27-16 at 7. Brookins was "struggl[ing]" to decide whether the incident was an accident or suicide. *Id.* at 8. But because, without a death certificate "you cannot embalm somebody" or "cremate a decedent," Brookins issued the death certificate which classified the incident as an accidental death, but then reached out to the Office of the Chief Medical Examiner of North Carolina for "assistance." *Id.* at 9.

---

[1] This alternative date, which would have been nearly three years *after* Decedent's death, reflects a possible transcription error. It's possible the deponent intended to state that the note was last edited in May of 2021, which would have been three months before the incident.

5

Doctor Julie Hull was the associate chief medical examiner for the state of North Carolina. DE 27-17 at 4. In that role, she reviews thousands of death reports each year that are submitted by local medical examiners like Brookins. *Id.* at 4-5. Dr. Hull reviewed Decedent's case, which included consideration of "the report of investigation by the medical examiner, the toxicology [report,] law enforcement reports[,] and photographs." *Id.* at 8-9.

After reviewing those materials, Dr. Hull "changed the manner of death" to suicide, "based on the definition of suicide." *Id.* at 10. Her office defines suicide as "death at one's own hand," meaning a "volitional act" that "results in death . . . irrespective of explicit or implicit intent" to end one's life." *Id.* As a result, her office issued an amended death certificate on April 12, 2022, which superseded the certificate that Brookins issued. *Id.* at 13; *see also* DE 27-13 at 2. After Dr. Hull issued the amended death certificate, Brookins testified that she has "no doubt" that the incident meets "the medical examiner standard for suicide." DE 27-16 at 15-17.

At the same time Dr. Hull was in the process of reviewing Decedent's case, Defendant conducted its own investigation. *See* DE 27-2 at 4-5; DE 27-5 at 2. To do so, Defendant engaged Broyles Claim Decision Support ("BCDS"), a third-party investigator. DE 27-14 at 2. A.K. Broyles ("Broyles"), President and Chief Executive Officer of BCDS, led the investigation. *See id.* (Broyles affidavit reflecting that he is "also a Case Manager").

Broyles interviewed Plaintiff, multiple law enforcement officers, including Detective Tollesrud, Brookins, and one of Decedent's coworkers. *See generally* DE 31-5 at 2-18.[2] Plaintiff told Broyles that Decedent "was not in any way suicidal at any time ever" and that his "death was absolutely an accident." *Id.* at 2-3. Detective Tollesrud told Broyles that he "did not locate any indication or evidence of suicidal ideation or any history of suicidal activity." *Id.* at 4. Another

---

[2] The statements that follow in this paragraph are not included for the truth of the matter asserted, but rather for the extent to which they provided notice to Broyles. *See United States v. Cone*, 714 F.3d 197, 219 (4th Cir. 2013).

crime scene investigator indicated that he "did not locate any indication or evidence of suicidal ideation or any history of suicidal activity." *Id.* at 5. Brookins stated that none of the evidence she reviewed suggested that Decedent had any "motive to take his own life." *Id.* at 11. And Decedent's coworker told Broyles that Decedent "was a happy person" and "never complained about anything." *Id.* at 17-18.

After receiving that information, Broyles attempted to contact Dr. Hull for several months, while her review of Decedent's case was ongoing. *See id.* at 16 (Broyles' note from November 10, 2021 reflecting that he is "still seeking a response from Dr. Hull"), 20 (November 20, 2021 note stating that Broyles has "continued to follow up and request that Dr. Hull contact us regarding the investigation of the insured's death but are still seeking a response from her"), 22 (as of December 2, 2021, Broyles has "not received a response from Dr. Hull"), 27 (stating on December 17, 2021, that Broyles "will continue to follow up" with Dr. Hull "for status information").

Notably, Broyles' files indicate that, in reaching out to Dr. Hull, he was trying "to make a formal request to have the death certificate amended." *Id.* at 34. And he separately attempted to request an amendment to the death certificate with the North Carolina Office of Vital Records (the agency that maintains custody of death certificates). *Id.* Broyles' notes do not indicate the purpose of this request, or the basis for it. *See id.* Broyles ultimately never made direct contact with Dr. Hull, who stated at her deposition that Broyles' efforts had no impact on her investigation. DE 27-17 at 15.

In March 2022, Defendant retained Ronald Wm. Maris, Ph.D., a forensic suicide expert. DE 27-6 at 2. Dr. Maris agreed to spend fifteen hours to review the evidence and "sketch a report." *Id.* Dr. Maris concluded that Decedent was most likely playing "Russian Roulette" with the firearm, and that "[i]f so, his death" would qualify as "a suicide." *Id.* at 8 (emphasis omitted). Dr.

7

Maris's report was finalized on April 9, 2022, three days before Dr. Hull issued the amended death certificate. *Id.* at 2; *see also* DE 27-13 at 2.

By letter dated May 6, 2022, Defendant denied Plaintiff's claim for benefits under the Policy. DE 27-8 at 2. Defendant's letter indicates that, based on a review of "information obtained during" the "investigation, it appears [Decedent's] death was the result of a suicide." *Id.* Defendant enclosed with its letter a check representing the refund of premiums plus interest. *Id.* This action followed.

## II. PROCEDURAL HISTORY

In December 2023, Plaintiff initiated this action in state court. DE1-1; DE 1-2. Plaintiff's Complaint raises five claims: (1) Breach of Contract, (2) Statutory Bad Faith, (3) Unfair and Deceptive Trade Practices, (4) Tortious Interference with Contract, and (5) Amendment of Death Certification. DE 1-2 at 10-18. Shortly thereafter, Defendant removed the action to federal court, invoking the court's diversity subject-matter jurisdiction. DE 1 at 2.

After the close of discovery, Defendant moved for partial summary judgment. DE 25. First, Defendant seeks partial summary judgment on Plaintiff's breach of contract claim, arguing that the Children's Term Rider (which provides for $20,000 if a child of the Insured dies while the Rider is in force) is inapplicable under the circumstances, and that only Plaintiff's claim for $250,000 (the face value of the Policy) should proceed to trial. DE 28 at 9-11.

Defendant also seeks summary judgment on Plaintiff's tort claims. Defendant contends that its failure to define the term "suicide" in the Policy is not actionable. *Id.* at 14-15. Defendant further asserts that it had a contractual right to investigate Decedent's death, and exercised that right in a reasonable manner, so it is not liable for statutory bad faith. *Id.* at 15-20. Defendant also rejects the theory that Broyles' attempted contacts with Dr. Hull proximately caused Plaintiff any

harm. *Id.* at 20-22. Last, Defendant contends that Plaintiff's tortious interference claim fails as a matter of law because Defendant cannot interfere with its own contract. *Id.* at 24-25.

Plaintiff also moved for partial summary judgment, limited to her claim for breach of contract. DE 29. Plaintiff asserts that it would be "a waste of judicial resources and an insult to the life of a loving son, dedicated employee, and beloved friend and brother to many, to allow Defendant to continue its charade of pretending that they have a sufficient factual basis to deny this claim upon the suicide exclusion." DE 32 at 8. In that regard, Plaintiff contends that the evidence overwhelmingly refutes the notion that Decedent committed suicide. *See id.* at 10-13.

Finally, Plaintiff moves in limine to exclude certain evidence. DE 33. Plaintiff seeks to exclude the note on Decedent's phone entitled "If I Die – Kinda Will" as irrelevant. DE 35 at 2. Plaintiff also seeks to exclude the expert report of Defendant's expert, Dr. Christopher Ticknor, DE 34, and any testimony or reports from Dr. Hull and Brookins classifying Decedent's death as a suicide, DE 36. Plaintiff only seeks to exclude the evidence from Dr. Ticknor, Dr. Hull, and Brookins in "the Breach of Contract Phase of Trial" based on her assumption that the court "will bifurcate" the contract and tort claims "pursuant to Federal Rule of Civil Procedure 42(b)." DE 36 at 1.

The three pending motions are full briefed and ready for decision. DE 42; DE 46; DE 47; DE 48; DE 49; DE 51.

## III. STANDARDS OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party."

9

*Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). At this stage, the court must not "weigh the evidence and determine the truth of the matter but [merely] determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining the existence of a genuine issue of material fact, the court considers the evidence in the light most favorable to the non-moving party and "draw[s] all reasonable inferences in favor of [that] party." *Emmons v. City of Chesapeake*, 982 F.3d 245, 250 (4th Cir. 2020).

Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient." *Anderson*, 477 U.S. at 252. To that point, a party's "[u]nsupported speculation is not sufficient to defeat a summary judgment motion," *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987), and any inference drawn in the non-movant's favor must not be "so tenuous that it rests merely upon speculation and conjecture," *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020) (quoting *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982)).

With those principles in mind, the moving party ultimately need not "produce evidence showing the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Rather, "the burden on the moving party may be discharged by showing. . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (internal quotation marks omitted). When the movant does so, the burden shifts to the nonmovant to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted). A showing of specific facts requires "cit[ation] to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The existence of "some metaphysical doubt as to the material facts" does not suffice. *Matsushita*, 475 U.S. at 586.

10

When considering cross-motions for partial summary judgment, the court must "consider each motion separately on its own merits," *Defenders of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014), and "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing" partial summary judgment, *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation mark omitted). In other words, "[t]he court is not permitted to resolve genuine issues of material fact on a motion for summary judgment—even where . . . both parties have filed cross motions for summary judgment." *ITCO Corp. v. Michelin Tire Corp., Com. Div.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983) (emphasis omitted). "Where genuine issues of material fact are revealed, the duty of the court is to deny summary judgment and to permit the case to go to trial." *Id.*

## IV. ANALYSIS

### a. Plaintiff's Motion in Limine

The court will address Plaintiff's motion in limine first because, to a certain extent, resolution of that motion could influence the body of evidence under consideration with respect to the parties' cross-motions for summary judgment. Plaintiff's motion targets three discrete pieces of evidence.

First, Plaintiff seeks to exclude Decedent's cell phone note entitled "If I Die - Kinda Will" as irrelevant. DE 33 at 1. According to Plaintiff, the note is irrelevant because it "does not equate to evidence that [Decedent] harbored suicidal intent," and "was drafted a full year before" the incident. DE 35 at 2-3. Defendant counters that the note is admissible because this case centers around "circumstantial evidence" and the note "provides insight as to Decedent's personality, mental state, and outlook on life and death less than a year before he fatally shot himself." DE 49 at 2.

11

The court agrees with Defendant. Relevant evidence is that which has a "tendency to make a fact" of consequence "more or less probable than it would be without the evidence." Fed. R. Evid. 401. This case concerns whether Decedent committed a voluntary act with the intent to end his own life or was the victim of an accident. *See Maddox v. Colonial Life & Acc. Ins. Co.*, 303 N.C. 648, 652, 280 S.E.2d 907, 909 (1981). The gravamen of that inquiry is his mental state. *See Thaxton v. Metro. Life Ins. Co.*, 143 N.C. 33, 55 S.E. 419, 420 (1906).

Tragically, Decedent can no longer provide direct evidence of his mental state on the evening of August 18, 2021. Thus, the factfinder must rely on circumstantial evidence to draw inferences on that issue. And evidence that Decedent drafted a will,[3] i.e., that he prepared a document to be used in the event of his death, bears on his mental state and is relevant.

The court likewise does not find that the passage of time between the drafting of the will and the incident undermines its relevance. In that regard, a will is unlike the circumstantial evidence at issue in the cases cited by Plaintiff (such as evidence of mental distress or marital disharmony), where there was a subsequent "change of condition," *Adcock v. Life Assur. Co. of Carolina*, 31 N.C. App. 97, 100, 228 S.E.2d 654, 656 (1976), or the evidence otherwise grew stale and therefore "was too remote to be of probative value," *Drain v. United Servs. Life Ins. Co.*, 85 N.C. App. 174, 184, 354 S.E.2d 269, 276 (1987). Moreover, there is a genuine dispute over the

---

[3] The court is referring to this document as a "will" for the sake of brevity and consistency with its title on Decedent's phone, but a rational factfinder could interpret the document as encompassing more than that. For example, Decedent's note reflects that he "Dissociate[s] Very Easily," is not "Scared Of Living Or Dying," and is "Unsure Of What Happens After Death, But [Decedent will] Get to See 'Her,' [Decedent's] Little Blue Star." DE 34-3 at 6. The note also includes that Decedent has "Been Hurting For A While," and expresses his view that life has "Been Fun And It's Been Real, But It Ain't Been Real Fun." *Id.* at 8 (first quote), 10 (second quote) (capitalization throughout in original). Certainly these musings "do[] not equate to evidence that [Decedent] harbored suicidal intent," DE 35 at 2-3, but they are relevant to that issue. Circumstantial evidence that Decedent, a young man, was "Hurting" and not "Scared Of . . . Dying," *id.* at 6, is probative to the factfinder's assessment of whether what occurred on August 18, 2021 was an accidental or intentional act.

12

extent to which Decedent revisited the will on his phone in the months leading up to his death. *See* DE 49-1 at 2. Plaintiff's motion in limine is denied as to the cell phone note.[4]

In addition, Plaintiff seeks to exclude the expert report and testimony of Dr. Ticknor and the testimony and report of Brookins and Dr. Hull "in the Breach of Contract Claim phase of trial only." DE 33 at 1. Plaintiff moves to exclude this evidence only with respect to her claim for breach of contract based on her assumption "that the [c]ourt will bifurcate" the contract and tort "claims pursuant to Federal Rule of Civil Procedure 42(b)." DE 34 at 1; DE 36 at 1.

Rule 42 of the Federal Rules of Civil Procedure provides that "the court may order a separate trial of one or more . . . claims" for "convenience, to avoid prejudice, or to expedite and economize" the proceedings. Fed. R. Civ. P. 42(b). This discretionary authority is infrequently invoked because "a single trial is the norm." *Biedermann Techs. GmbH & Co. KG v. K2M, Inc.*, No. 2:18-CV-585, 2021 WL 8445265, at *2 (E.D. Va. Oct. 5, 2021). In most cases, "a single trial will be more expedient and efficient." *F & G Scrolling Mouse, L.L.C. v. IBM Corp.*, 190 F.R.D. 385, 387 (M.D.N.C. 1999); *see also Blessing v. Sirius XM Radio Inc.*, 756 F. Supp. 2d 445, 460 (S.D.N.Y. 2010) (explaining that "[b]ifurcation is the exception, not the rule, . . . and the party seeking it bears the burden of establishing that it is warranted").

The court is not inclined to sua sponte bifurcate in this case, given that liability on the contract and extracontractual claims can operate independently. As North Carolina's Court of Appeals explained in the *Nelson* case, "[a]n action for unfair or deceptive practices is a creation of statute, and therefore *sui generis*, so the cause of action exists independently, regardless of whether a contract was breached." *Nelson v. Hartford Underwriters Ins. Co.*, 177 N.C. App. 595, 609, 630

---

[4] In concluding this aspect of her motion, Plaintiff contends in conclusory fashion that any "marginal relevance" of the note "is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time." Quoting the language of Rule 403 of the Federal Rules of Evidence is insufficient to obtain a ruling in limine, and the court reserves ruling on any Rule 403 issues until a more fully developed argument is presented.

S.E.2d 221, 231 (2006) (and noting further that, "even if an insurance company rightly denies an insured's claim, and therefore does not breach its contract, . . . the insurance company nevertheless must employ good business practices which are neither unfair nor deceptive"); *cf. Johnson v. Baltimore Police Dep't*, 500 F. Supp. 3d 454, 460 (D. Md. 2020) (explaining that cases containing individual capacity Section 1983 claim and *Monell* claim are "are good candidates for bifurcation" because there is no *Monell* liability without an "initial finding that a government employee violated a plaintiff's constitutional rights"). Accordingly, and because the parties have not briefed bifurcation, Plaintiff's motion in limine as to the evidence from Dr. Ticknor, Brookins, and Dr. Hull is denied without prejudice to Plaintiff filing a motion to bifurcate and then re-raising the arguments in her motion in limine.

b. Defendant's Motion for Partial Summary Judgment

Defendant seeks partial summary judgment on Plaintiff's breach of contract claim, acknowledging that the claim for the $250,000 death benefit should proceed to trial but contending that it is entitled to judgment as a matter of law with respect to the Children's Term Rider. DE 25 at 1. Defendant also seeks summary judgment on each of Plaintiff's tort claims. *Id.* The court discusses each in turn.

i. *Children's Term Rider*

Plaintiff's first claim seeks $270,000 for Defendant's alleged breach of contract, which includes both the $250,000 death benefit and the $20,000 Children's Rider. *See* DE 1-2 at 10-11. Defendant seeks summary judgment as to the Children's Rider because that provision kicks in only if a child of the Insured dies while the Rider is in force. DE 28 at 8; DE 27-2 at 2-3, 5. Decedent was the Insured under the Policy, and had no children (much less any children who died), so the provision is inapplicable. *See generally id.*; *see also* DE 34-1 at 23.

14

In responding to Defendant's motion, Plaintiff clarifies that she is only pursuing "the Breach of Contract claim for the Two Hundred Fifty Thousand Dollar death benefit under the Policy." DE 42 at 3. Plaintiff's statement represents a "clear and unambiguous" abandonment of any claim for the Children's Rider. *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 91 (4th Cir. 2018); *see also Lemmons v. Georgetown Univ. Hosp.*, 241 F.R.D. 15, 31 (D.D.C. 2007) (explaining that "abandonment has occurred" where there is an "explicit and unambiguous statement by the plaintiff that a particular claim was no longer being brought") (emphasis omitted). Accordingly, the court finds that Plaintiff has abandoned her claim for the Children's Rider, dismisses that claim, and denies Defendant's motion as moot with regard to the Children's Rider.

## ii. *Tortious Interference with Contract*

Plaintiff's fourth claim alleges that Broyles tortiously interfered with the Policy. *See* DE 1-2 at 17-18. Defendant seeks summary judgment on that claim because Broyles was Defendant's agent, and a party (generally) cannot tortiously interfere with its own contract. DE 28 at 24-25; *see also Billos v. Evonik Stockhausen, LLC*, No. 1:11-CV-905, 2012 WL 3835899, at *3 (M.D.N.C. Sept. 4, 2012) (collecting cases and observing that "[b]oth North Carolina and federal courts interpreting North Carolina law have consistently held that a party to a contract cannot tortiously interfere with its own contract"); *Bloch v. The Paul Revere Life Ins. Co.*, 143 N.C. App. 228, 240, 547 S.E.2d 51, 60 (2001) (outlining limited circumstances in which non-outsider to contract may tortiously interfere with contract). In responding to Defendant's motion, Plaintiff indicates that she is only pursuing her claims for breach of contract, statutory bad faith, and unfair and deceptive trade practices, and "does not pursue the claim for Tortious Interference with Contract." DE 42 at 3. The court thus finds that Plaintiff has abandoned her tortious interference

claim, dismisses it, and denies Defendant's motion as moot with regard to the tortious interference claim. *See AirFacts, Inc.*, 909 F.3d at 91; *Lemmons*, 241 F.R.D. at 31.

### iii. *Unfair and Deceptive Trade Practices*

Defendants further seek summary judgment on Plaintiff's second and third claims. Plaintiff's second claim is entitled "Statutory Bad Faith – N.C. Gen. Stat. 58-63-15(11) and N.C. Gen. Stat. 75-1.1 et. seq." and her third claim is entitled "Unfair Settlement Practices/Unfair and Deceptive Trade Practices (Violation of N.C.G.S. § 75-1.1 et. seq.)." DE 1-2 at 11, 15. The Statutory Bad Faith claim cites "Section 58–63–15(11), which addresses unfair claim settlement practices." *Davis v. State Farm Life Ins. Co.*, 163 F. Supp. 3d 299, 307 (E.D.N.C. 2016). And both of her claims cite North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), located at N.C.G.S. § 75-1.1.

Most "relevant here, § 75-1.1 provides a private cause of action for violations," *Elliott v. Am. States Ins. Co.*, 883 F.3d 384, 396 (4th Cir. 2018), whereas "Section 58-63-15(11) does not provide a private right of action," *Teijin Auto. Techs. NA Holding Corp. v. Sompo Am. Ins. Co.*, No. 1:24-CV-159, 2025 WL 932934, at *9 (M.D.N.C. Mar. 27, 2025). "Thus, a plaintiff's private remedy for violation of § 58-63-15(11) is to file a UDTPA claim." *Lifebrite Hosp. Grp. of Stokes, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 1:22-CV-849, 2023 WL 6201460, at *5 (M.D.N.C. Sept. 22, 2023). In that regard, "an individual may file an independent § 75-1.1 claim, or may file a § 75-1.1 claim that relies on a violation of § 58-63-15(11)." *Elliott*, 883 F.3d at 396.

Accordingly, the court will construe Plaintiff's second and third claims as *one* UDTPA claim that is premised on multiple theories, including violations of Section 58-63-15(11). "North Carolina's UDTPA prohibits 'unfair methods of competition in or affecting commerce,' as well as 'unfair or deceptive acts or practices in or affecting commerce.'" *CPI Sec. Sys., Inc. v. Vivint*

16

*Smart Home, Inc.*, __ F.4th __, __, 2025 WL 2045323, at \*4 (4th Cir. July 22, 2025) (internal brackets omitted) (quoting N.C.G.S. § 75-1.1(a)).  To establish a violation of the UDTPA, a "plaintiff must show (1) an unfair or deceptive act or practice (2) in or affecting commerce (3) which proximately caused actual injury to the plaintiff." *Kelly v. Georgia-Pac. LLC*, 671 F. Supp. 2d 785, 798 (E.D.N.C. 2009).  A violation "of [Section] 58–63–15(11) constitutes a violation of N.C.G.S. § 75–1.1, as a matter of law." *Gray v. N. Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 71, 529 S.E.2d 676, 683 (2000).

After reviewing the record in the light most favorable to Plaintiff, and drawing reasonable inferences in her favor, the court will deny Defendant's motion as to the UDTPA claim because a rational factfinder could conclude that Defendant "[r]efus[ed] to pay" the "claim[] without conducting a reasonable investigation based upon all available information." N.C.G.S. § 58-63-15(11)(d).  In that regard, Broyles' concerted efforts to contact Dr. Hull (and the North Carolina Office of Vital Records) to request an amendment to the death certificate provide some circumstantial evidence that Defendant, rather than engage in a neutral fact-finding endeavor, sought to manufacture a documentary record that would support denial of Plaintiff's claim.

Broyles' efforts to contact Dr. Hull spanned months, while her review of Decedent's case was ongoing.  DE 31-5 at 16 (Broyles' note from November 10, 2021 reflecting that he is "still seeking a response from Dr. Hull"), 20 (November 20, 2021 note stating that Broyles has "continued to follow up and request that Dr. Hull contact us regarding the investigation of the insured's death but are still seeking a response from her"), 22 (as of December 2, 2021, Broyles has "not received a response from Dr. Hull"), 27 (stating on December 17, 2021, that Broyles "will continue to follow up" with Dr. Hull "for status information").  Notably, Broyles' files indicate

17

that, in reaching out to Dr. Hull (and the North Carolina Office of Vital Records), he was trying "to make a formal request to have the death certificate amended." *Id.* at 34.

Viewed in the light most favorable to Plaintiff, those efforts could be considered to represent some evidence of an unreasonable investigation by Defendant. Nothing in the Policy required Defendant to obtain a death certificate that denoted suicide as the cause of death prior to denying Plaintiff's claim. *See* DE 27-3 at 13. Which begs the question: why was Broyles trying to obtain one? His efforts reasonably permit the inference that Defendant predetermined that it would deny Plaintiff's claim and then, rather than conduct a reasonable investigation, sought to accumulate evidence that would support that decision. Put another way, if Defendant was objectively investigating Decedent's death with an open mind, there would have been no apparent reason to request a change to the death certificate. An insurance company conducts a reasonable investigation when it "relie[s] on medical experts," not when it seeks to influence the work product of those same experts. *Cobb v. Pennsylvania Life Ins. Co.*, 215 N.C. App. 268, 279, 715 S.E.2d 541, 551 (2011).

Broyles' conduct appears even more questionable when viewed in chronological context. Right before attempting to contact Dr. Hull, Broyles spoke to Plaintiff, Brookins, two law enforcement officers who responded to the scene, and one of Decedent's coworkers. *Id.* at 2-18. All of them told Broyles that they considered the incident to be an accidental shooting, and that there was no evidence of suicidal ideation or motive. *See generally id.* Then, notwithstanding those uniform perspectives, Broyles tried to submit a formal request to amend the death certificate to suicide. A rational factfinder could conclude that Broyles had no reasonable basis to make such a request.

18

On this point, Defendant argues that Broyles' conduct did not proximately cause any injury to Plaintiff because he did not influence Dr. Hull, pointing to her deposition testimony that Broyles' efforts had no impact on her investigation. DE 27-17 at 15; DE 28 at 21-22. But it is immaterial that Broyles never made contact with Dr. Hull, and this argument misunderstands the theory of harm. Broyles' efforts to influence Dr. Hull, though ultimately unsuccessful, are circumstantial evidence of the approach that Defendant took to its investigation, which concluded with the denial of Plaintiff's claim. Thus, if a jury determines that Broyles' conduct was improper and representative of an unreasonable investigation, it could likewise conclude that such conduct proximately harmed Plaintiff, because Broyles' acts are imputable to Defendant. DE 27-14 at 2. And Defendant denied Plaintiff's claim at the conclusion of its investigation.

Considering the current procedural posture, the court finds that a jury should resolve whether Defendant conducted a reasonable investigation. *See, e.g.*, *Kielbania v. Indian Harbor Ins. Co.*, No. 1:11-CV-663, 2012 WL 3957926, at *11 n.7 (M.D.N.C. Sept. 10, 2012) (recommending that UDTPA claim proceed to trial based in part on evidence that insurance company's agent engaged in "*ex parte* contact" with appraiser which could "be indicative of efforts to improperly influence the appraisal process"), *recommendation adop*ted, No. 1:11-CV-663, 2012 WL 6554081 (M.D.N.C. Dec. 14, 2012); *Penn Nat'l Sec. Ins. Co. v. LinkOne SRC, LLC*, 542 F. Supp. 3d 355, 370 (E.D.N.C. 2021) (denying summary judgment on insurance-related UDTPA claim because jury could conclude that defendant failed to "properly and fairly handle[ plaintiff's] claim"); *Copsis v. Auto-Owners Ins. Co.*, No. 3:10-CV-170, 2011 WL 62117, at *2 (W.D.N.C. Jan. 7, 2011) (reflecting court's "reticen[ce] to decide that" insurance company "properly handled the claim while there is still dispute as to whether the claim was properly denied"). Defendant's

motion is denied with respect to Plaintiff's UDTPA claim premised on a violation of Section 58-63-15(11)(d).

With that said, the court finds that Plaintiff has not advanced any other triable theory of a UDTPA violation.[5] Plaintiff argues that "Defendant has repeatedly misrepresented the facts and policy provisions with respect to the definition of suicide," which would supposedly violate Section 58-63-15(11)(a). DE 42 at 22. But "[a Section] 75-1.1 claim based on a misrepresentation requires a plaintiff to demonstrate reliance on the misrepresentation in order to show the necessary proximate cause." *DENC, LLC v. Philadelphia Indem. Ins. Co.*, 426 F. Supp. 3d 151, 157 (M.D.N.C. 2019), *aff'd*, 32 F.4th 38 (4th Cir. 2022). Plaintiff has failed to identify any facts supporting that she relied on Defendant's allegedly erroneous interpretation of suicide.

Plaintiff also contends that Defendant "failed to provide 'a reasonable explanation of the basis in the insurance policy' for the denial." DE 42 at 22 (quoting N.C.G.S. § 58-63-15(11)(n)). The record does not support this contention. In its May 6, 2022 letter denying Plaintiff's claim, Defendant stated its conclusion that Decedent's "death was the result of a suicide" and therefore Plaintiff's benefit is limited to the "Suicide Death Benefit" which "is equal to a refund of all premiums paid." DE 27-8 at 2. Plaintiff may disagree with Defendant's conclusion as to Decedent's manner of death, but Defendant's explanation clearly identifies the "basis in the insurance policy" for its decision. N.C.G.S. § 58-63-15(11)(n); *see also* DE 27-3 at 13.

Plaintiff further asserts that Defendant violated the UDTPA because Defendant "based its denial upon" the wrong definition of suicide by crediting the opinions of Dr. Hull and Dr. Maris,

---

[5] The court has limited its analysis to those theories raised by Plaintiff in her opposition to Defendant's motion. *See* DE 42. To the extent Plaintiff's Complaint identifies additional theories, those are forfeited by her failure to raise them in opposing Defendant's motion. *See United States ex rel. Rosales v. Amedisys N. Carolina, L.L.C.*, 128 F.4th 548, 561 (4th Cir. 2025) (holding that party's failure to raise argument in brief meant that party "forfeits any such argument"); *Adkins v. Marathon Petroleum Co., LP*, 105 F.4th 841, 854 (6th Cir. 2024) (concluding that, "at the summary judgment stage, the non-moving party can forfeit an argument if they fail to respond to the moving party's arguments").

"people who used a different definition of suicide than that which applied to the policy." DE 42 at 24. This assertion is a non sequitur.

North Carolina's Supreme Court has held that, where the term suicide is not defined in a policy, it should be construed "in a manner consistent with the context in which it is used and the meaning accorded it in ordinary speech." *Maddox*, 303 N.C. at 652, 280 S.E.2d at 909. After reviewing several dictionaries, the *Maddox* Court concluded "that in its ordinary use, the term suicide embodies not merely an intent to do the act which ultimately results in one's own death, but the intent to end one's own life." *Id.*

Even accepting the premise that Dr. Hull and Dr. Maris defined suicide differently than its definition under North Carolina law,[6] there is no evidence that Defendant adopted the same definition as them. Defendant based its denial decision on the physical evidence that a loaded gun was placed against the side of Decedent's head and then fired, Dr. Hull's finding, and Dr. Maris' report, ultimately concluding that Decedent committed suicide. DE 27-8 at 2. Defendant did not purport to define suicide in rendering this conclusion and never indicated that any piece of evidence in isolation was sufficient to support its conclusion. In other words, the record lacks evidence that Defendant adopted the "wrong" definition of suicide when determining that Decedent committed suicide.

Last, in responding to Defendant's motion Plaintiff also raises arguments in support of a claim for common law bad faith. DE 42 at 14. Plaintiff's Complaint does not include a claim for

---

[6] Dr. Hull defined suicide differently than *Maddox*; her office defines suicide as a "volitional act" that "results in death . . . irrespective of explicit or implicit intent" to end one's life. DE 27-17 at 10. It's less clear that Dr. Maris defined suicide differently. He did write in his report that, if Decedent was playing Russian Roulette, "his death" would qualify as "a suicide." DE 27-6 at 8. But some activities may be so inherently dangerous so as to permit the inference that the person engaging in the activity harbored subjective intent to end his own life. And Plaintiff hasn't developed any argument to the contrary, merely asserting that Russian Roulette "would not constitute suicide" within the meaning of the Policy. DE 42 at 25 (internal quotation marks omitted).

21

common law bad faith; Count 2 is entitled "Statutory Bad Faith." DE 1-2 at 11.[7] Common law bad faith and statutory bad faith are different claims with different elements. Plaintiff has not requested Defendant's consent or leave of court to amend her Complaint to add a claim for common law bad faith. Fed. R. Civ. P. 15(a)(2). And "[i]t is well-established that parties cannot amend their complaints through briefing." *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).[8]

Accordingly, the court denies Defendant's motion with regard to Plaintiff's UDTPA claim premised on a violation of Section 58-63-15(11)(d), but otherwise grants the motion as to any other UDTPA claim.

c. Plaintiff's Motion for Partial Summary Judgment

Plaintiff also moves for partial summary judgment with respect to her claim for breach of contract. DE 29. Plaintiff contends that it would be "a waste of judicial resources and an insult to the life of a loving son, dedicated employee, and beloved friend and brother to many, to allow

---

[7] In the final sentence of one paragraph in the Complaint's section on statutory bad faith, Plaintiff also alleges that "[t]he same constitutes Common Law Bad Faith." DE 1-2 at 15. This sort of conclusory assertion of a claim in a pleading does not meet the requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure. *United States v. Fernandez Sanchez*, 46 F.4th 211, 219 (4th Cir. 2022); *Multari v. Fakhoury*, No. 5:23-CV-631, 2024 WL 3166897, at *5 (E.D.N.C. June 25, 2024) (holding that plaintiffs' conclusory assertion that they "were fraudulently induced" into entering agreement was insufficient to "assert a claim for fraudulent inducement").

[8] Even if Plaintiff had adequately raised a claim for common law bad faith in her Complaint, the court would find that she has failed to identify "materials in the record" to support an essential element of that claim. Fed. R. Civ. P. 56(c)(1)(A). On that front, a claim for common law bad faith requires a showing that the insurance company "refus[ed] to pay *after recognition* of a valid claim." *Universal Underwriters Ins. Co. v. Lallier*, 334 F. Supp. 3d 723, 736 (E.D.N.C. 2018) (emphasis added). Here, Plaintiff has not pointed to any evidence in the record supporting that Defendant recognized that her claim was valid before it denied the claim. Plaintiff argues that the evidence was "clear" that Decedent's death was accidental. DE 42 at 14. But it is one thing to say that Defendant possessed some evidence supporting a conclusion of accidental death. It is quite another to say that Defendant both possessed that evidence and recognized that the claim was valid. That is why Plaintiff's invocation of *Robinson v. North Carolina Farm Bureau* is inapposite. In that case, after a fire destroyed the plaintiff's business, the defendant insurance company "told plaintiff there would be no problem in getting the money to rebuild the building" and that the "defendant would pay the full claim." *Robinson v. N. Carolina Farm Bureau Ins. Co.*, 86 N.C. App. 44, 46, 356 S.E.2d 392, 393 (1987). In other words, the defendant in *Robinson* recognized the existence of a valid claim and then "delayed payment" for seven months so that it could hire "a building contractor to produce a low estimate to do the repairs." *Id.* at 50, 396. Here, Plaintiff has failed to point to comparable evidence in the record that would permit the inference that Defendant "recogni[zed] a valid claim" and then "refus[ed] to pay." *Universal Underwriters*, 334 F. Supp. 3d at 736.

Defendant to continue its charade of pretending that they have a sufficient factual basis to deny this claim upon the suicide exclusion." DE 32 at 8. This contention has emotional appeal but little persuasive force.

The record evidence in this case is undisputed that a loaded gun was pressed against the side of Decedent's head and then fired, resulting in Decedent's death. *See* DE 27-10 at 4; DE 27-11 at 4; DE 47-3 at 19. That physical evidence alone would permit a reasonable factfinder to conclude that Decedent committed suicide. *See Richardson v. New York Life Ins. Co.*, 174 F.2d 475, 475 (4th Cir. 1949) (describing similar evidence as "proof of suicide [] so clear as to leave no room for doubt"); *Gorham v. Mut. Ben. Health & Acc. Ass'n of Omaha*, 114 F.2d 97, 98 (4th Cir. 1940) (expressing view that self-inflicted gunshot wound, "which entered a little above and to the rear of the right ear, effectually negatived any theory of accidental discharge").

To be sure, the evidence in the record cuts both ways. Shortly before his death, Decedent was drafting an email to his manager at work that discussed a pay raise, and future planning activities are usually inconsistent with suicide. DE 31-3 at 1-3; DE 31-7 at 3; DE 47-3 at 39. Family and friends described him as happy. DE 31-5 at 2, 17-18. Brookins initially concluded that the incident was an accidental shooting. DE 27-10 at 5. Law enforcement found no evidence of suicidal ideation or intent. DE 27-11 at 9. And yet on the other hand, the physical evidence permits the inference that Decedent shot himself in the head, and he had a will drafted on his phone. DE 27-10 at 4; DE 27-11 at 4; DE 34-3 at 6-10.

When there more than a scintilla of evidence on each side of the ledger, the court may not undertake the task of assessing whether the weight of the evidence tips in one direction or the other. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) ("Summary judgment cannot be granted merely because the court believes that" one party "will prevail if the

action is tried on the merits."). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter"; the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. And "[a] suicide case should be tried like any other case[.] If the evidence is conflicting, or if different inferences can reasonably be drawn from it, the case is for the jury." *Gorham*, 114 F.2d at 100. As the foregoing recitation of evidence makes apparent, this case is one for the jury, and Plaintiff's motion for partial summary judgment is denied.

## V.    CONCLUSION

Plaintiff's motion in limine [DE 33] is DENIED IN PART and DENIED IN PART WITHOUT PREJUDICE. Plaintiff's motion for partial summary judgment [DE 29] is DENIED. Defendant's motion for partial summary judgment [DE 25] is GRANTED IN PART and DENIED IN PART and DENIED IN PART AS MOOT.

Plaintiff's breach of contract claim and UDTPA claim (premised on a violation of N.C.G.S. § 58-63-15(11)(d)) will proceed to a jury trial. All deadlines in the court's trial scheduling order at Docket Entry 55 remain in effect.

SO ORDERED this _____4th_____ day of August, 2025.

_Richard E Myers II_
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

24